IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY MARKS, | ) | CASE NO.  1:25-CV-02279-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | MAGISTRATE JUDGE |
| ADMINISTRATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Kimberly Marks ("Plaintiff" or "Marks"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In July 2022, Marks filed an application for SSI, alleging a disability onset date of January 1, 2013, and claiming she was disabled due to lupus, Sjogren syndrome, inflammatory arthritis, Raynaud syndrome, obesity, chronic migraine, tremors, high blood pressure, neuropathy, fibromyalgia, chronic fatigue, chronic pain syndrome, gait instability, chronic obstruction pulmonary disease, chronic insomnia, cervicalgia, heart attack, right knee, severe seasonal allergies, depression, and anxiety. (Transcript ("Tr.") 17, 95.) The

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

1

application was denied initially and upon reconsideration, and Marks requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 17.)

On September 10, 2024, an ALJ held a hearing, during which Marks, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On October 10, 2024, the ALJ issued a written decision finding Marks was not disabled. (*Id.* at 17-31.) The ALJ's decision became final on August 21, 2025, when the Appeals Council declined further review. (*Id.* at 1-6.)

On October 22, 2025, Marks filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7-8.) Marks asserts the following assignment of error:

(1)     THE ADMINISTRATIVE JUDGE'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE WHEN HER RFC IS NOT AN ACCURATE REFLELCTION OF PLAINTIFF'S RFC AND SHE DID NOT PROPERLY EVALUATE PLAINTIFF'S ALLEGATIONS PURSUANT TO SSR 16-3p.

(Doc. No. 7 at 10.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Marks was born in December 1973 and was 50 years old at the time of her administrative hearing (Tr. 17, 29), making her a "person closely approaching advanced age" under Social Security regulations. *See* 20 C.F.R. § 416.963(d). She has at least a high school education. (Tr. 29.) She has no past relevant work. (*Id.*)

**B.     Relevant Medical Evidence[2]**

On July 22, 2021, Marks saw Nicholas Ksenich, M.D., for a three month follow up and medication management.  (*Id.* at 454-55.)  Marks reported ongoing pain and swelling of her right knee, and Dr. Ksenich referred her to orthopedics for an MRI.  (*Id.* at 455.)  Marks told Dr. Ksenich her medications were helpful.  (*Id.*)  Dr. Ksenich noted Marks' COPD, hypertension, and migraines were stable.  (*Id.* at 455-56.)  Marks reported continued lupus and rheumatoid arthritis, and she asked for an evaluation by a new rheumatologist.  (*Id.* at 456.)  Marks told Dr. Ksenich that her pain medicine helped her chronic muscle spasm.  (*Id.*)  Marks rated her average pain during the past week as a 1/10 and her worst pain in the past week as a 9/10.  (*Id.*)  She told Dr. Ksenich that 95% of her pain had been relieved during the past week and that the amount of pain relief she obtained from her current pain medication was "enough to make a real difference in her life."  (*Id.*)  On examination, Dr. Ksenich found full range of motion of the extremities, normal neurovascular examination, and normal motor, sensory, and cerebellar function.  (*Id.* at 461.)  Dr. Ksenich started Marks on hydrocodone-acetaminophen and tizanidine for fibromyalgia.  (*Id.* at 454.)

On November 11, 2021, Marks saw Robert Zanotti, M.D., for follow up regarding inflammatory arthritis in her knee.  (*Id.* at 424.)  Marks reported she could not take NSAIDs because of her gastrointestinal issues, and cortisone helped for one week.  (*Id.*)  She used a brace to help with instability.  (*Id.*)  On examination, Dr. Zanotti found mild McMurray exam, effusion, good straight leg raise, extension to 0 degrees and flexion to 150 degrees, weightbearing with discomfort, and antalgic gait secondary to discomfort.  (*Id.* at 427.)  X-rays taken in August 2021 revealed Marks was "nearing bone-on-bone," and a follow up MRI showed "really not much left in that lateral compartment."  (*Id.* at 428.)  Marks' diagnoses

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Marks only challenges the ALJ's physical findings, the Court further limits its discussion of the medical evidence to Marks' physical impairments.

consisted of primary osteoarthritis of one knee and rheumatoid arthritis.  (*Id.* at 424.)  Dr. Zanotti noted he wanted to hold off on arthroplasty at this time and ordered a gel injection.  (*Id.*)

On February 24, 2022, Marks saw Dr. Zanotti for follow up of her right knee pain and reported she had tried lupus medication and steroid injections without relief.  (*Id.* at 406.)  On examination, Dr. Zanotti found tenderness to the touch along the medial and lateral aspect with catching, locking, or mechanical symptoms, a mild McMurray exam without evidence of instability, negative Lachman test, pivot shift test, and posterior drawer test, no foot drop, numbness, or tingling, intact sensation, reflexes, and pulses, effusion, good straight leg raise, extension to 0 degrees and flexion to 160 degrees, weightbearing with discomfort, and antalgic gait secondary to discomfort.  (*Id.* at 409-10.)  A recent MRI revealed no obvious retear of the meniscus and mild to minimal arthritic change.  (*Id.* at 410.)  Dr. Zanotti noted that Marks was already wearing a brace and that he was going to try a nerve geniculate block.  (*Id.* at 406.)

On April 21, 2022, Marks saw Dr. Ksenich for follow up regarding her anxiety and fibromyalgia. (*Id.* at 542-433.)  Marks endorsed ongoing pain that was "all over" and wanted medication.  (*Id.* at 543.) Dr. Ksenich suggested pain management.  (*Id.*)  Dr. Ksenich noted Marks' insomnia, COPD, hypertension, and migraines were stable.  (*Id.* at 543-44.)  Marks reported continued lupus and rheumatoid arthritis.  (*Id.* at 544.)  Marks told Dr. Ksenich that her pain medicine helped her chronic muscle spasm.  (*Id.*)  Marks rated her average pain during the past week as a 1/10 and her worst pain in the past week as a 9/10.  (*Id.*)  She told Dr. Ksenich that 95% of her pain had been relieved during the past week and that the amount of pain relief she obtained from her current pain medication was "enough to make a real difference in her life." (*Id.*)  On examination, Dr. Ksenich found full range of motion of the extremities, normal neurovascular examination, and normal motor, sensory, and cerebellar function.  (*Id.* at 549.)

On May 26, 2022, Marks saw Dr. Zanotti for follow up.  (*Id.* at 401.)  Dr. Zanotti noted Marks was not a surgical candidate and she had decided against a nerve ablation.  (*Id.*)  Dr. Zanotti further noted Marks

4

saw Dr. Ksenich for pain management.  (*Id.*)  Marks showed instability and, because of her lupus, "her ligaments [we]re quite insufficient."  (*Id.* at 401-02.)  Dr. Zanotti opined that Marks was "anteriorly/posteriorly unstable" and needed a custom ACL brace.  (*Id.* at 402.)  On examination, Dr. Zanotti found "about a 2 to 3+ Lachman with a very soft endpoint" and a range of motion of 0 to 160 degrees.  (*Id.* at 405.)  X-rays revealed "mild to moderate arthritic joint space narrowing," but no bone-on-bone.  (*Id.*)

On July 18, 2022, Marks saw Dr. Ksenich for follow up regarding her anxiety, back pain, and insomnia.  (*Id.* at 555-56.)  Marks reported continued ongoing pain that was "all over."  (*Id.* at 556.)  Dr. Ksenich directed Marks to see a rheumatologist and suggested pain management.  (*Id.*)  Dr. Ksenich noted Marks' COPD, hypertension, and migraines were stable.  (*Id.* at 556-57.)  Marks reported continued lupus and rheumatoid arthritis.  (*Id.* at 557.)  Marks told Dr. Ksenich that her pain medicine helped her chronic muscle spasm.  (*Id.*)  Marks rated her average pain during the past week as a 1/10 and her worst pain in the past week as a 9/10.  (*Id.*)  She told Dr. Ksenich that 95% of her pain had been relieved during the past week and that the amount of pain relief she obtained from her current pain medication was "enough to make a real difference in her life."  (*Id.*)  On examination, Dr. Ksenich found full range of motion of the extremities, normal neurovascular examination, and normal motor, sensory, and cerebellar function.  (*Id.* at 562.)

On October 25, 2022, Marks saw Dr. Ksenich for follow up regarding her chronic pain.  (*Id.* at 924-25.)  Marks reported continued ongoing pain that was "all over," which Dr. Ksenich noted was stable.  (*Id.* at 925.)  Dr. Ksenich further noted Marks' COPD, hypertension, and migraines were stable.  (*Id.* at 925-26.)  Marks reported continued lupus and rheumatoid arthritis.  (*Id.* at 926.)  Marks told Dr. Ksenich that her pain medicine helped her chronic muscle spasm.  (*Id.*)  Marks rated her average pain during the past week as a 1/10 and her worst pain in the past week as a 9/10.  (*Id.*)  She told Dr. Ksenich that 95% of her pain had been relieved during the past week and that the amount of pain relief she obtained from her current pain medication was "enough to make a real difference in her life."  (*Id.*)  On examination, Dr. Ksenich found

5

full range of motion of the extremities, normal neurovascular examination, and normal motor, sensory, and cerebellar function. (*Id.* at 931.)

On January 23, 2023, Marks saw Dr. Ksenich for follow up regarding her chronic pain. (*Id.* at 938-39.) Marks reported getting breakthrough headaches about a week before she was scheduled to get her Almovig shot. (*Id.* at 939.) Marks endorsed continued ongoing pain that was "all over," which Dr. Ksenich noted was stable. (*Id.*) Dr. Ksenich further noted Marks' COPD, hypertension, and migraines were stable. (*Id.* at 939-40.) Marks reported continued lupus and rheumatoid arthritis. (*Id.* at 940.) Marks told Dr. Ksenich that her pain medicine helped her chronic muscle spasm. (*Id.*) Marks rated her average pain during the past week as a 1/10 and her worst pain in the past week as a 9/10. (*Id.*) She told Dr. Ksenich that 95% of her pain had been relieved during the past week and that the amount of pain relief she obtained from her current pain medication was "enough to make a real difference in her life." (*Id.* at 941.) On examination, Dr. Ksenich found full range of motion of the extremities, normal neurovascular examination, and normal motor, sensory, and cerebellar function. (*Id.* at 945.)

On February 2, 2023, Marks saw Wes Holiday, D.O., for an initial evaluation of her coronary artery disease, cardiomyopathy, and hypertension. (*Id.* at 709.) Marks complained of chest heaviness and rapid heartbeat the past few weeks, and it felt like someone was sitting on her chest. (*Id.*) Associated symptoms included shortness of breath with exertion and fatigue. (*Id.*) Marks reported that her symptoms were worsening and becoming more frequent. (*Id.*) On examination, Dr. Holiday found normal heart rate, normal rhythm, normal S1 and S2, and no murmurs, rubs, clicks, or gallops. (*Id.* at 713.)

On March 2, 2023, Marks saw Dr. Zanotti for follow up of her right knee pain. (*Id.* at 1010.) A recent MRI revealed a "large recurrent meniscus tear." (*Id.*) Dr. Zanotti noted that injections had not helped. (*Id.*) On examination, Dr. Zanotti found flexion of 0 to 160 degrees with medial and lateral joint line pain,

6

mild crepitus, pain, catching, locking, and mechanical symptoms, and a "clear positive McMurray." (*Id.* at 1013.)  Dr. Zanotti recommended arthroscopy with a possible arthroplasty in two to five years. (*Id.* at 1010.)

On April 18, 2023, Marks saw Dr. Ksenich for a preoperative examination for right knee surgery. (*Id.* at 968.)  Dr. Ksenich noted no progression of lupus symptoms and stable rheumatoid arthritis, migraine, coronary artery disease, COPD, and hypertension.  (*Id.* at 968-69.)

Marks underwent arthroscopic surgery on her right knee on May 2, 2023.  (*Id.* at 850.)

On June 26, 2023, Marks saw Robert Harasty, PA-C, for an examination seven weeks after her right knee surgery.  (*Id.* at 994, 997.)  Marks reported "recurrent effusions, pain, and soreness." (*Id.* at 994.)  On examination, Harasty found trace effusion, collateral integrity, and no gross evidence of instability.  (*Id.* at 997.)  Harasty prescribed a prednisone Dosepak and opined: "Her options are limited.  She is also in the process of filing for disability.  From our findings so far, we would recommend permanent sit-down or sedentary work where she is not on her feet."  (*Id.* at 994.)

On August 2, 2023, Marks saw Gerald Gavlak, PA-C, for complaints of low back pain.  (*Id.* at 984, 988.)  On examination, Gavlak found an antalgic gait, decreased range of motion of the lumbar spine with flexion, extension, and rotation, tenderness of the lumbar paraspinous musculature, normal strength, and no swelling or point tenderness of the upper and lower extremities.  (*Id.* at 987-88.)  Marks refused physical therapy and declined pain management and epidural injections.  (*Id.* at 984.)

On May 6, 2024, Marks saw Dr. Ksenich for follow up regarding her rheumatoid arthritis, coronary artery disease, hypertension, and lupus.  (*Id.* at 1212.)  Dr. Ksenich noted "[m]ultiple fibromyalgia pain points" and instructed Marks to keep her rheumatology evaluation.  (*Id.*)  Dr. Ksenich further noted a tremor and recommended Marks obtain a neurological evaluation.  (*Id.*)

## C.    State Agency Reports

On November 7, 2022, King Leong, M.D., reviewed the file and opined that Marks could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 102, 105.) She could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.* at 102.) She could frequently push/pull with the right lower extremity. (*Id.*) Marks could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. (*Id.*) She could frequently balance and occasionally stoop, kneel, crouch, and crawl. (*Id.*) She must avoid concentrated exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, etc., and hazards. (*Id.* at 103.)

On December 6, 2023, on reconsideration, Leon Hughes, M.D., reviewed the file and affirmed Dr. Leong's findings. (*Id.* at 115-119.)

## D.    Hearing Testimony

During the September 10, 2024 hearing, Marks testified to the following:

- She lives alone and has done so for five years. (*Id.* at 41.) She holds a valid driver's license with no restrictions. (*Id.* at 42.) She lives in a townhome. (*Id.* at 51.)

- Her lupus and rheumatoid arthritis in her lower back, neck, right hip, and right knee prevent her from working. (*Id.* at 44-45.) She also has Sjogren's, an autoimmune disease, which causes dry mouth and dry eyes. (*Id.* at 48.) She carries a cup and eye drops with her everywhere. (*Id.*) She also has COPD. (*Id.* at 49.) She gets about four migraines a month, and each migraine can last up to three days. (*Id.* at 56.) Smells trigger her migraines. (*Id.*)

- She has bone spurs in her right hip. (*Id.* at 46.) She had a meniscus tear in her right knee, for which she underwent "a small surgery." (*Id.* at 47.) The surgery caused her lupus to go "haywire," and now she needs a knee replacement. (*Id.*) She is unwilling to go through knee replacement surgery at this time because after doing her research, she is not comfortable with having it done. (*Id.*) She wears a knee brace daily. (*Id.*)

- She is in constant pain. (*Id.* at 45.) Her lupus has affected her muscles, joints, digestive system, kidneys, and heart. (*Id.*) Her doctors took her off Methotrexate, as it was not helping and her liver started to deteriorate. (*Id.* at 45-46.) She takes muscle relaxers, pain medication, and anti-inflammatories. (*Id.* at 45.)

- People come over to help her around the house. (*Id.* at 50.) Her cousin helps clean the house and helps her with laundry. (*Id.*) If no one comes over, she can do a little bit at

8

a time around the house.  (*Id.*)  She does her own grocery shopping and cooking.  (*Id.*)  She can shop for 20 minutes while leaning on something.  (*Id.* at 55.)  She can do dishes, but she must take breaks because she cannot stand for very long.  (*Id.* at 51.)  She can clean counters and sinks, but she cannot bend down to clean the bathtub and the toilet.  (*Id.*)

• She spends her days reading and watching TV.  (*Id.* at 51-52.)  She loves to read and reads a lot.  (*Id.* at 52.)  She cannot hold the book, so it is always propped up on something.  (*Id.* at 56.)  She may straighten up the house a bit.  (*Id.* at 52.)  She stays at home and does not go anywhere.  (*Id.*)  She goes to dinner with her boyfriend on occasion.  (*Id.* at 54.)  She may leave the house once a week depending on whether she has doctors' appointments.  (*Id.* at 55.)

The ALJ found Marks had no past relevant work.  (*Id.* at 44.)  The ALJ then posed the following hypothetical question:

> I'm going to ask you to please assume an individual of Ms. Marks' age, education and the work experience and if you can please assume that this hypothetical individual can perform light work, but with the following additional limitations.  He or she can frequently push and pull with the right lower extremity; occasionally climb ramps and stairs; never climb ladders, ropes and scaffolds; frequently balance; occasionally stoop, kneel, crouch and crawl; be able to be frequently exposed to extreme cold, fumes, odors, dusts, gases and poor ventilation as well as hazards of unprotected heights and dangerous machinery.  This individual – let me see can perform tasks that do not involve a specific production rate pace, assembly line work or an hourly production quota.  Can have frequent interactions with supervisors, coworkers and the public and can deal with changes in a routine setting.  All right, with these limitations, can you please advise are there jobs for such an individual with these limitations?

(*Id.* at 59-60.)

The VE testified the hypothetical individual would be able to perform other representative jobs in the economy, such as router, order caller, and information clerk.  (*Id.* at 60.)

In response to questioning from Marks' counsel, the VE testified that an employer may tolerate up to one absence a month, but if an individual continued to be absent, arrive late, or leave early two or more times a month on a regular or ongoing basis, such an individual would be reprimanded and/or terminated.  (*Id.* at 61.)

9

### III.  STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since July 19, 2022, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: diffuse diseases of the connective tissue; osteoarthrosis and allied disorders; disorders of the skeletal spine;

10

migraine; chronic obstructive pulmonary disease ("COPD"); inflammatory arthritis; fibromyalgia; obesity; anxiety and obsessive-compulsive disorders; and depressive, bipolar, and related disorders (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). In addition, the claimant can frequently push/pull with the right lower extremity. The claimant can occasionally climb ramps/stairs; can never climb ladders/ropes/scaffolds; can frequently balance; and can occasionally stoop, kneel, crouch, and crawl. The claimant can have no more than frequent exposure to exposure to extreme cold, fumes, odors, dusts, gases, poor ventilation, and hazards such as unprotected heights and dangerous machinery. The claimant can perform tasks that do not involve a specific production rate pace (i.e., assembly line work or an hourly production quota). The claimant can have frequent interaction with supervisors, co-workers, and the public. The claimant can deal with routine changes in a routine setting.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on December **, 1973 and was 48 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.    The claimant has at least a high school education (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since July 19, 2022, the date the application was filed (20 CFR 416.920(g)).

(Tr. 20-30.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

11

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the

12

Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. First Assignment of Error: Subjective Symptom Analysis

Marks argues that the ALJ erred in evaluating her subjective complaints, as "the ALJ uses boilerplate language to find Plaintiff's allegations not entirely credible and fails to provide a proper analysis of Plaintiff's subjective complaints or valid reasons for discrediting Plaintiff's allegations." (Doc. No. 7 at 13.) Marks asserts that the ALJ's reliance on her ability to live alone and perform activities of daily living in discrediting Marks' subjective complaints is "flawed," as one's "ability to live independently does not equate to" the ability to work full-time on a sustained basis and she needs helps from others to perform her daily activities. (*Id.* at 14.) In addition, the ALJ discounted Marks' subjective complaints because she could walk without an assistive device, yet Marks testified she must lean on something when she shops, and Marks has "consistently reported problems with standing and walking." (*Id.*) In addition, treatment notes reflect findings of an antalgic gait. (*Id.* at 14-15.) Marks maintains that the objective evidence in the record supports her subjective complaints, and the ALJ's "failure to articulate why this objective evidence is not

13

consistent with Plaintiff's allegations should be found as not supported by substantial evidence." (*Id.* at 15.) Marks then recites evidence she argues supports her allegations. (*Id.* at 15-16.) Marks also argues that the ALJ's decision "contains very little if any meaningful discussion" of the factors set forth in SSR 16-3p. (*Id.* at 16-17.)

The Commissioner responds that substantial evidence supports the ALJ's subjective symptom analysis. (Doc. No. 8 at 3.) The ALJ "engaged in a thorough discussion" of Marks' subjective complaints and discussed factors set forth in 20 C.F.R. 416.929(c)(3). (*Id.* at 4-7.) In addition, the ALJ considered the medical opinion evidence, and Marks fails to challenge the evaluation of the medical opinion evidence on judicial review. (*Id.* at 6.) The Commissioner argues that "[i]mportantly, there is no medical opinion more limiting than the [prior administrative medical findings]." (*Id.*) (citing *Carver v. Saul*, No. 3:20-CV-00051, 2020 WL 8458801, at *15 (N.D. Ohio Oct. 5, 2020)).

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 416.929(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human*

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3p was in effect at the time of the September 10, 2024 hearing.

*Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. § 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[4]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Marks' testimony and other statements regarding her symptoms and limitations.  (Tr. 24.)  The ALJ determined Marks' medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.*)  However, the ALJ found Marks' statements concerning

---

[4] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision.  (*Id*.)

In evaluating Marks' subjective symptoms, the ALJ found as follows:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are not fully consistent with the record. The record indicates work limitations from lupus complications, knee pain and instability, hip pain, back pain, and anxiety. However, despite her impairments, the claimant is able to perform activities of daily living independently. She is able to live independently, is able to perform tasks such as driving and going shopping in stores, is able to perform some household chores, is able to spend time with her boyfriend and family members and is able to engage in hobbies such as reading. While the claimant has a history of right knee procedures and imaging has noted degenerative changes in the right knee, she is able to walk using a right knee brace. Imaging has also noted degenerative changes in the back, but the claimant refused offers for physical therapy, pain management, and epidural injections. The record does not indicate a high degree of medication side effects from her current medications. The record also indicates that treatment has helped manage her anxiety and depression. Overall, the above activities of daily living and medical record show a greater level of functioning than generally alleged and are consistent with the ability to perform a limited range of unskilled light work.
>
> The record indicates work limitations due to her history of lupus and degenerative changes in the right knee and right hip. However, the record also indicates that the claimant can walk without assistive devices, can live independently, and is able to perform activities of daily living independently such as driving and going shopping in stores. The claimant has stated that she was diagnosed with lupus around 2014, and treatment notes have indicated that she has tried lupus medications and steroid injections with limited success. She underwent a right knee arthroscopy and cleanout in May 2021. Imaging of her right knee in January and February 2022 noted mild osteoarthritic changes and small knee effusion without no evidence of an acute osseous fracture (Exhibit 2F/3, 4). Imaging of her right knee in May 2022 noted mild to moderate joint space narrowing and progressing inflammatory arthritic change (Exhibit B3F/6). An examiner prescribed the claimant a custom ACL brace due to instability in the right knee (Exhibit 2F/2). Evidence of lupus complications and the need for a custom right knee brace indicates some limitations in the claimant's ability to perform work activities.
>
> The claimant has received regular follow-up examinations with Nicholas Ksenich, M.D., about every three weeks for her impairments including anxiety, back pain, and insomnia. In July 2022, Dr. Ksenich noted that the claimant has ongoing pain due to lupus with ongoing anxiety and insomnia, but her coronary artery disease, insomnia, COPD, depression, acid reflux, hypertension, and

migraines were stable (Exhibit B4F/104-106). A physical examination noted that the claimant had clear lungs, had normal cardiovascular and neurovascular findings, and had normal findings in the arms and legs. In an October 2022, the claimant described her pain as ongoing and stable, but Dr. Ksenich again had stable physical examination findings (Exhibit B8F/10). Stable physical examination findings, along with evidence that medication and treatment can help manage many of her impairments, indicate that the claimant has the ability to perform some work-related tasks.

(*Id.* at 24-25.)

In addition, elsewhere in the RFC analysis, the ALJ noted findings inconsistent with disability, including:

- Stable examination findings.

- The ability to walk using a knee brace.

- The ability to perform activities of daily living independently despite Marks' pain.

- Normal muscle strength and intact sensation.[5]

- Marks' refusal of physical therapy, pain management, and epidural injections.

(*Id.* at 25-26.)

The Court finds substantial evidence supports the ALJ's assessment of Marks' subjective complaints. The record evidence, as set forth above and as noted by the ALJ, is not entirely consistent with Marks' allegations of disabling conditions. (*Id.* at 24-29.) The ALJ credited some of Marks' subjective symptoms but did not accept them to the extent alleged by Marks because of findings on examinations, her own statements, and activities of daily living, factors to be considered under the regulations. (*Id.*) Contrary to Marks' argument, the ALJ recognized that Marks testified she got help with housekeeping and laundry and the notations of an antalgic gait. (*Id.* at 24-26.)

---

[5] The Court notes that while Marks suffers from fibromyalgia, which the ALJ found to be a severe impairment at Step Two, Marks makes no argument that the ALJ failed to consider her fibromyalgia as required under SSR 12-2p or otherwise erred in relying on normal examination findings to discount her complaints of chronic pain. (*See* Doc. No. 7.) The Court shall not make such arguments for her.

17

It is the ALJ's job to weigh the evidence and resolve conflicts, and she did so here.  While Marks would weigh the evidence differently, it is not for the Court to do so on appeal.  The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision.  The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

**B.      Second Assignment of Error: RFC Challenge**

Marks argues that the ALJ erred in the RFC analysis by failing "to incorporate Plaintiff's ability to sustain gainful employment."  (Doc. No. 7 at 11.)  Marks asserts that despite the ALJ "acknowledging" that Marks suffers from insomnia, lupus, fibromyalgia, and migraines, the ALJ failed to "include any limitations regarding absences caused by these impairments or any explanation as to why she failed to do so."  (*Id.* at 12.)  Marks maintains that the ALJ "committed legal error" in failing to address absences in the RFC.  (*Id.* at 13.)  Marks also argues the ALJ failed to build an accurate and logical bridge between the evidence and the ALJ's conclusions.  (*Id.*)

The Commissioner responds that it was Marks' burden to prove she could not work because of excessive absences, and Marks "failed to carry her burden."  (Doc. No. 8 at 8.)  Instead, Marks asks the Court to try this case *de novo*, which it may not do.  (*Id.*)  In addition, the Commissioner asserts that "no medical source in the record opined that Plaintiff had any absenteeism limitations."  (*Id.*) (citing *Beck v. Comm'r of Soc. Sec.*, Case No. 4:19-cv-02320, 2020 WL 6585956, at *14 (N.D. Ohio May 4, 2020), *report and recommendation adopted by* 2020 WL 5417536 (N.D. Ohio Sept. 10, 2020)).  Therefore, the Commissioner maintains that substantial evidence supports the ALJ's RFC determination.  (*Id.* at 9.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a)(1). A claimant's RFC is not a medical opinion, but an administrative

determination reserved to the Commissioner. *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. § 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination. *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*). However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014)

19

(reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The ALJ's RFC analysis contains a thorough discussion of the record evidence and the ALJ made a clear connection between the evidence and the RFC findings. (Tr. 24-29.) The ALJ acknowledged and weighed the medical opinions in the record (*id.*), and Marks does not challenge the ALJ's findings regarding those opinions or the weight assigned. As discussed *supra*, the ALJ clearly articulated the basis for the subjective symptom determination in this case. As the Commissioner argues, no medical opinions or other medical evidence support Marks' claim regarding absenteeism. Therefore, her argument is without merit. *See Beck*, 2020 WL 6585956, at *14 (collecting cases).

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: June 25, 2026

          *s/ Jonathan Greenberg*
          Jonathan D. Greenberg
          United States Magistrate Judge

## **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.** *Berkshire v. Beauvais*, **928 F.3d 520, 530-31 (6th Cir. 2019).**